IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED COALS, INC.

      Plaintiff,

  v.               Civil Action No.:  1:19-cv-95
                                      (Kleeh)

ATTIJARIWAFA BANK,

      Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS [ECF NO. 4]

---

Pending before the Court is Defendant Attijariwafa Bank's Motion to Dismiss and Notice Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure.  The issues have been fully briefed and the matter is ripe for decision.  For the reasons discussed herein, the Court **DENIES** the motion.

## I.   <u>PROCEDURAL HISTORY</u>

Plaintiff filed this action in the Circuit Court of Harrison County, West Virginia on November 5, 2018.  ECF No. 1-1 at 19.  Its Complaint alleges two causes of action:  breach of contract and promissory estoppel.  <u>Id</u>. at ¶¶104-113 and 114-123.  Defendant removed the matter to the United States District Court for the Northern District of West Virginia on April 24, 2019.  ECF No. 1.  This Court entered its First Order and Notice establishing certain deadlines on April 30, 2019.  ECF No. 2.  By the parties' joint

motion, the Court stayed those deadlines.  ECF No. 11.  Defendant filed its Motion to Dismiss on jurisdictional grounds on May 17, 2019.  ECF No. 4.  Plaintiff responded in opposition and Defendant filed its reply brief on June 28, 2019.  ECF Nos. 15 and 20.  This Court entered its Order denying the Motion to Dismiss on March 30, 2020.  ECF No. 32.  This Memorandum Opinion now follows outlining the Court's analysis in detail.

## II.   <u>FACTUAL BACKGROUND</u>

According to the Complaint,[1] Plaintiff United Coals, Inc. ("United") had interest in establishing a business relationship with the Electricity Branch of the Moroccan National Office of Electricity and Drinking Water ("ONEE").  ECF No. 1-1 at ¶6.  To that end, United appointed a registered agent in Morocco, Richard G. Leon ("Leon").  <u>Id</u>. at ¶2.  Leon was initially appointed United's agent around October 10, 2013.  <u>See</u> Declaration of Jeffrey A. Goldizen, ECF No. 15-1, at ¶5.  He was United's only agent in Morocco.  <u>Id</u>.  United also initiated contact and a business relationship with Defendant Attijariwafa Bank ("the Bank").

---

[1] The Court is mindful of the burdens applicable to a Rule 12(b)(2) motion.  "In deciding whether the plaintiff has proved a <u>prima facie</u> case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor."  <u>See</u> <u>Mylan Labs., Inc. v. Akzo, N.V.</u>, 2 F.3d 56, 60 (4th Cir. 1993)(citations omitted).

---

A non-addressed letter announcing Leon's agency was provided to the Bank.  Id.  Of note, that letter indicates Leon was appointed United's sole representative with respect to "(i) procuring debt or equity capital from banks or other sources from the country of Morocco, (ii) procuring coal purchase contracts from the country of Morocco and (iii) pursuing such other business activities and ventures as may benefit United Coals, Inc."  Id. at Ex. 1.  The same letter notes Leon was appointed by "United Coals, Inc., West Virginia, USA."  Id.

Specific notice of Leon's agency was provided to the Bank in a letter addressed to Mr. Mohammed Kamal ED-DAHABI dated December 30, 2013.  Id. at ¶7 and Ex. 2.  That same letter outlines the contracts United secured with ONEE and requests the Bank open an account for United to handle the two transactions.  Id. at Ex. 2. United was specific that the account would be used to manage the letter of credit with ONEE and must be able to send and receive international wire transfers both to and from the United States of America.  Id.  The letter, authored by Goldizen, was sent on United's letterhead noting its Clarksburg, West Virginia location and was notarized by a West Virginia notary public.  Id.

United alleges it contracted with ONEE to ship coal to ONEE at the Port of Casablanca, Morocco.  Id. at ¶6-8.  Those shipments were covered by two different contracts, ONEE Contract No. 415 and

ONEE Contract No. 425.  ECF No. 1-1 at ¶6.  Contract No. 415 was
for a shipment of 192,000 metric tons of steam coal in six cargoes
while Contact No. 425 called for 96,000 metric tons of steam coal
delivered to the Port of Casablanca in three cargoes.  Id.
Together, the ONEE contracts had a gross value of $26,784,000 to
United.  ECF No. 15-1, at ¶4.

ONEE agreed to pay United through irrevocable documentary
credit at a prime bank in favor of United.  EFC No. 1-1 at ¶10.
Initially, as of December 30, 2013, United expected ONEE to apply
to the Bank for issuance of the letters of credit pursuant to the
terms of Contract No. 415 and Contract No. 425.  Id. at ¶11.  In
the December 30, 2013 letter described above, United opened an
account with Defendant Attijariwafa Bank to accept and distribute
wire transfers and manage its Line of Credit with ONEE.  ONEE later
decided to have a different bank issue the required letters of
credit.  Id. at ¶13.

Plaintiff intended to fulfill its coal shipment obligations
to ONEE with coal purchased from Emerald International Corporation
("Emerald"), a Kentucky-based coal company.  Id. at ¶¶23-24.  The
coal was located near New Orleans, Louisiana and was to be shipped
directly from the state of Louisiana to a Casablanca, Morocco port.
Id. at ¶14.  Prior to entering into any contractual relationship
with Emerald, United arranged for transport of the coal with a

---

Bahamas-based broker, Agriculture & Energy Carriers, Ltd.  <u>Id</u>. Eventually, the <u>M/V Mardinik</u> vessel was designated to transport the coal.  That vessel was based at Myrtle Grove, Louisiana.  <u>Id</u>. at ¶¶14-18.

United opened its account, 0541 R 000428033, with the Bank's Casablanca, Morocco branch.  <u>Id</u>. at ¶34.  United alleges at least one agreement was in place between it and the Bank with respect to that account.  Declaration of James L. Marketos, ECF No. 15-2 at ¶¶5-7 and Ex. 1.[2]

The Complaint alleges a number of transactions and events related to United's claims against the Bank.  Specifically, United alleges the Bank repeatedly promised to provide letters of credit to support United in its efforts to perform its obligations under the ONEE contracts.  ECF No. 1-1 at ¶¶55, 62 and 80.  United further alleges it took action or refrained from acting in reliance on the Bank's promises.  <u>Id</u>. at ¶57.  United alleges its reliance on the Bank caused it financial harm as the Bank allegedly never fulfilled its promises.  <u>Id</u>. at ¶¶68, 71, 72 and 79.  United further alleges communications between the Bank and Leon, United's authorized Moroccan agent.  <u>Id</u>. at ¶25; ECF No. 15-1 at ¶14.  In

---

[2] Two other documents apparently bear Goldizen's signature and may be agreements between United and the Bank.  <u>Id</u>. at ¶¶8-9.  Those agreements are related to the same transactional relationship made subject of the Complaint.

_____

its response to the pending motion, United also identifies five (5) communications it alleges were direct from the Bank to Jeffrey A. Goldizen, United's West Virginia-based President and sole shareholder:

1. April 9, 2014 email[3] forwarding proof of payment of a Bank fee (ECF No. 15-1 at ¶15);

2. April 10, 2014 email regarding issuance of a letter of credit (Id.);

3. April 28, 2014 letter advising of a letter of credit (Id.);

4. April 28, 2014 email forwarding acknowledgment of Plaintiff's order to wire funds to Emerald (Id.); and,

5. April 30, 2014 email forwarding a letter (15-1 at ¶15).

There were numerous communications with United's agent in Morocco however.[4]  Id. at ¶14; see also Compl.  Goldizen states Leon kept him "regularly abreast of such communications."  Id.

_____

[3] One of the email addresses listed on these communications, presumably Goldizen's email address, is jeff@golddiggerswv.com. It is unclear if the Bank's officials were aware of the significance of the "wv" portion of that email address; however, it certainly indicates, again, United's location and base of operations was not a secret.

[4] The century-old principles of agency mandate that such communications be considered made to United as a matter of law. See Syl. Pt. 1, Buckeye Saw Mfg. Co. v. Rutherford, 64 S.E. 444 (W. Va. 1909) ("Notice to an agent in the course of his employment in relation to a matter within the scope of his authority is

### III. APPLICABLE STANDARD

When a federal court's personal jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(2), it is ultimately the plaintiff's burden to prove that jurisdiction exists by a preponderance of the evidence. See Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted); see also Clark v. Milam, 830 F.Supp. 316, 318-19 (S.D.W. Va. 1993). When the court addresses the jurisdictional question "on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." New Wellington Financial Corp. v. Flagship Resort Development Corp., 416 F.3d 290, 294 (4th Cir. 2005). A plaintiff's burden is not considered particularly heavy. See Stand Energy Corp. v. Columbia Gas Transmission Corp., Docket No. 2:04-CV-0867, 2005 WL 1926639, at *2 (S.D.W. Va. August 8, 2005) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §1351 (1990)). "Mere allegations of personal jurisdiction are sufficient for a party to make a prima

---

notice to his principal, whether he communicates his knowledge to his principal or not.").

_facie_ showing." _Clark_, 830 F. Supp. at 319 (internal quotations and citations omitted). "In determining whether the plaintiff has made the requisite showing, the court must construe all relevant allegations of the pleadings and draw all reasonable inference in favor of the existence of jurisdiction." _Carefirst_, 334 F.3d at 396.

Two conditions must be satisfied for a district court to assert personal jurisdiction over a non-resident defendant: (1) a state long-arm jurisdiction statute must authorize jurisdiction over the non-resident defendant; and (2) the court's exercise of personal jurisdiction over the nonresident defendant must "comport with the Due Process Clause." _Mylan Lab, Inc.,_ 2 F.3d at 59-60. Because "the West Virginia long-arm statute is coextensive with the full reach of due process, it is [sometimes] unnecessary ... to go through the normal two-step formula for determining the existence of personal jurisdiction." _In re Celotex Corp. v. Rapid Am. Corp._, 124 F.3d 619, 627-28 (4th Cir. 1997) (citation omitted); _see also_ _York v. Property and Casualty Ins. Co. of Hartford_, No. 2:12cv06582, 2013 WL 5504435 (S.D.W. Va. Oct. 3, 2013) ("[T]he statutory inquiry merges with the constitutional inquiry, and the two inquires essentially become one."). Therefore, the court's inquiry primarily focuses on whether the

exercise of personal jurisdiction over the non-resident defendant is consistent with the Due Process Clause.

It is well established that the exercise of personal jurisdiction over the non-resident defendant is consistent with the Due Process Clause "if the defendant has sufficient 'minimum contacts' with the forum such that requiring the defendant to defend its interests in the forum does not 'offend traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). When assessing the "minimum contacts," courts should consider whether the defendant's contacts with the forum also provide the basis for the suit. Carefirst, 334 F.3d at 397.

If the defendant's contact with the forum state provides the basis for the suit, courts may exercise what is known as "specific jurisdiction." Id. To determine whether specific jurisdiction exists, the Court should consider the following: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" Id. If the defendant's contact with the forum state does not provide the basis for the suit, a court may only exercise "general

___

jurisdiction." <u>Id</u>. General jurisdiction is appropriate only where the defendant's contacts with the forum are "continuous and systematic." <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 415 (1984).[5]

## IV.  DISCUSSION

**A. Long-Arm Statute**

Defendant contends Plaintiff cannot satisfy either of the two prongs required in this analysis. With respect to the West Virginia long-arm statute initially, the Court disagrees. W. Va. Code §56-3-33 provides that a party may be served process in the State of West Virginia if it transacts any business in the state. That term is not defined in that section of code; however, W. Va. Code §31-D-1501, part of the West Virginia Business Corporation Act, provides:

> (d) A foreign corporation is deemed to be transacting business in this state if:
> (1) **The corporation makes a contract to be performed, in whole or in part, by any party thereto in this state**;
> (2) The corporation commits a tort, in whole or in part, in this state; or
> (3) The corporation manufactures, sells, offers for sale or supplies any product in a defective condition and that product causes injury to any person or property within this state notwithstanding the fact that the

___

[5] No allegation of general jurisdiction is made here and the Court finds, based on the record before it, that no continuous or systematic contacts exist. Thus, the court will only consider whether it has specific jurisdiction in this case.

> corporation had no agents, servants or
> employees or contacts within this state at the
> time of the injury.

W. Va. Code §31D-15-1501(d)(1) (emphasis added).  United and the

Bank allegedly entered into an "Account Agreement" and are the

only parties to that agreement.  See ECF No. 15-2 at ¶¶5-7 and Ex.

1.  At a minimum, that agreement implicated action by United, a

party to the contract, that would take place, in whole or in part,

in West Virginia.  Thus, the West Virginia long-arm statute is

satisfied.

### B.    Due Process

#### 1.    Purposeful Availment

Of course, that does not end the inquiry.  As noted, there

must be a sufficient basis for this Court to exercise jurisdiction

to satisfy the Bank's Due Process rights.  Under Carefirst, the

Court must first consider whether the Bank purposefully availed

itself of jurisdiction in the state of West Virginia.  Several

factors can carry Plaintiff's burden on this issue; however, many

of those are not present here.  The Fourth Circuit has explained

as follows:

> In the business context, these factors
> include, but are not limited to:
> • whether the defendant maintains offices or
> agents in the forum state, see McGee v. Int'l
> Life Ins. Co., 355 U.S. 220, 221, 78 S.Ct.
> 199, 2 L.Ed.2d 223 (1957);

• whether the defendant owns property in the forum state, see Base Metal Trading, Ltd. v. OJSC, 283 F.3d 208, 213 (4th Cir.2002);
• whether the defendant reached into the forum state to solicit or initiate business, see McGee, 355 U.S. at 221, 78 S.Ct. 199; Burger King, 471 U.S. at 475–76, 105 S.Ct. 2174;
• whether the defendant deliberately engaged in significant or long-term business activities in the forum state, see Burger King, 471 U.S. at 475–76, 481, 105 S.Ct. 2174;
• whether the parties contractually agreed that the law of the forum state would govern disputes, see Burger King, 471 U.S. at 481–82, 105 S.Ct. 2174;
• whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship, see Hirschkop & Grad, P.C. v. Robinson, 757 F.2d 1499, 1503 (4th Cir. 1985);
• the nature, quality and extent of the parties' communications about the business being transacted, see English & Smith, 901 F.2d at 39; and
• whether the performance of contractual duties was to occur within the forum, see Peanut Corp. of Am. v. Hollywood Brands, Inc., 696 F.2d 311, 314 (4th Cir. 1982).

Consulting Engineers Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009). The Fourth Circuit has observed "[t]he purposeful-availment test is flexible, and our analysis proceeds on a case-by-case basis." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 302 (4th Cir. 2012).

United concedes the Bank has never operated in the state of West Virginia, had employees here or visited the state. The

---

parties' agreement did not choose to apply West Virginia law. Plaintiff itself admits that it – not the Bank - initiated the business relationship at issue.[6]  The length of the relationship is also relevant.  All of these factors counsels against a finding that jurisdiction lies in this case; however, while significant, the Fourth Circuit has not found these factors to be dispositive or even more significant than other factors.  Nor are these factors the exclusive universe to be considered.  See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985) (noting it is an "inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.").

The Bank argues the only two factors which may form the basis of a jurisdictional finding are (1) "the nature, quality and extent of the parties' communication about the business being transacted" and (2) "whether the performance of contractual duties was to occur within the forum."  While that may be true, those factors can be

---

[6] This is certainly not dispositive.  "A prospective defendant need not initiate the relevant 'minimum contacts' to be regarded as purposefully availing himself of the privileges of conducting activity in the forum state."  Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 216 (4th Cir. 2001).

---

sufficient to satisfy this prong of the minimum contacts standard. Based on the record provided and considering the minimal burden Plaintiff must carry, the Court finds Plaintiff has made a prima facie showing on purposeful availment.

  The Bank focuses on the five contacts made **directly** with United here in West Virginia. The Bank's focus is too narrow not only with respect to the quantity of direct contacts but also its analysis of the totality of the parties' relationship as it pertains to minimum contacts with West Virginia. In other words, the Court must consider the qualitative weight of the contacts and the overall context of the contacts and the parties' relationship. Specifically, the Bank urges this Court to disregard any contacts with anyone even if related to the agreements and relationship made subject of the Complaint if that contact was not physically present within the borders of West Virginia. As an initial matter, the contacts with United's agent in Morocco are contacts with United by operation of law. Granted, "[t]he general rule of imputation of knowledge from agent to principal rests upon a legal fiction and a presumption. The fiction is that when the agent acts within the scope of the agency relationship, there is an identity of interest between principal and agent." Martin Marietta Corp. v. Gould, Inc., 70 F.3d 768, 773 (4th Cir. 1995)

(applying Maryland agency law).  The legal fiction of agency
applies, nonetheless.

There is nothing in the record before the Court indicating
United's Moroccan-based agent acted outside the scope of his agency
in his dealings with the Bank.  "An agent in the restricted and
proper sense is a representative of his principal in business or
contractual relations with third persons ... ."  Syl. Pt. 2, <u>Teter
v. Old Colony Co.</u>, 441 S.E.2d 728, 730 (W. Va. 1994).  As noted,
black letter law over a century in age mandates ""[n]otice to
an agent in the course of his employment in relation to a
matter within the scope of  his   authority   is   notice   to
his principal,   whether   he communicates his   knowledge   to
his principal or not."  Syl. Pt. 1, <u>Buckeye Saw Mfg. Co.</u>, 64 S.E.
at 44.  To ignore the contacts with United's Moroccan agent would
be to ignore the law – legal fiction or not.

The five "direct" contacts with individuals located within
the State's borders are also significant.  All of those contacts
were with United's president Jeffrey Goldizen.  The communications
were not meaningless pleasantries or mass email communications
where Goldizen just happened to be on a mailing list.  The
correspondence all dealt with substantive issues related to
letters of credit being issued pursuant to the agreement(s) between
the parties – and necessary to United's performance under the ONEEE

contracts, which the Bank knew was the sole reason for its business with United. The contacts also were related to the core of Plaintiff's claims – the Bank allegedly made promises which it failed to fulfill damaging United.

United's status as a West Virginia corporation was not a secret at the time the parties contemplated their relationship nor during its business interactions. As outlined, the Bank communicated directly with United in West Virginia on multiple occasions. Those communications were in addition to, as the Bank described it, United's agent in Morocco conducting "certain business" on United's behalf. ECF No. 5 at 2 (citing ECF No. 1-1 at ¶75). United describes it as "countless communications" with Leon. ECF No. 15 at 4 (citing ECF No. 15-1 at ¶14). As Leon was United's agent, a fact clearly communicated to the Bank in two different letters and recognized by the Bank as Leon is included on the "direct" communications with Goldizen, those communications are with United, in West Virginia, by operation of law.

United alleges the existence of at least one agreement, the Account Agreement, as the basis of its breach of contract claim. United and the Bank are the parties to that agreement. The Agreement requires certain acts from United which, because it is a West Virginia corporation with operations based in West Virginia,

necessitates that at least some aspects of contract performance are required to be done in this jurisdiction.

As noted, the Complaint outlines repeated promises from the Bank to provide letters of credit to United so that it could finance and perform its various obligations under the ONEE contracts. United clearly communicated its business interests in Morocco to the Bank and did so in writing at least twice via written correspondence. United, according to the Complaint, advised the Bank of the need for the letters of credit and took action in reliance on the Bank's promises to provide that financing and acted to its detriment based on those promises (e.g., continuing to incur demurrage charges on its appointed vessel). The Bank knew the stakes involved in United's business dealings and, according to the Complaint, promised to assist. These promises and failure to fulfill those promises not only allegedly negatively affected United but created a "substantial connection" by the Bank with United and this forum. In fact, a single act can form a "substantial connection" jurisdictional basis; however, as United alleges, the Bank made multiple promises it failed to satisfy. See Knisely v. National Better Living Ass'n, Inc., Docket No. 3:14-CV-15, 2015 WL 1868819, at *9, (N.D.W. Va. April 23, 2015)(quoting Burger King, 471 U.S. at 476 n.18)); see also Christian Science Board of Directors of First Church of Christ,

Scientist, 259 F.3d 209 (4th Cir. 2001)(noting "jurisdiction is proper where the defendant ... has created continuing obligations between himself and residents of the forum.")(internal quotations and citation omitted)).

Considering all of the factors outlined in Carefirst and considering United's "burden is not ... particularly heavy," United has carried its burden to establish, with a prima facie showing, that the Bank purposefully availed itself of the forum jurisdiction such that, on this factor, this Court's exercise of jurisdiction is not constitutionally offensive. Stand Energy Corp., 2005 WL 1926679 at *2.

### 2. Conduct Directed Toward West Virginia

This Court must also consider whether the claims at issue arise out of conduct directed toward the State of West Virginia. See Carefirst, 334 F.3d at 397. United asserts two claims in its Complaint – breach of contract and promissory estoppel. See generally Compl. The Bank has highlighted how it did not direct any attention of its own volition to the state of West Virginia. Thus, it stands to reason that the only contact it had with this forum is the relationship with United. That relationship is governed, United alleges, by agreements enforceable through a breach of contract claim or, alternatively, the Bank's alleged conduct is actionable under a promissory estoppel theory. Again,

United's status as a West Virginia-based company was not unknown to the Bank.  United alleges it stood to profit significantly here in West Virginia but for the Bank's alleged breach of the parties' agreement(s).[7]  There is a direct link between the contact and conduct the Bank engaged in vis-à-vis United and the state of West Virginia.

### 3.  Constitutional Reasonableness

Lastly, the constitutional reasonableness of personal jurisdiction must be weighed.  See Carefirst, 334 F.3d at 397. Here, the Court must ensure that litigating in this jurisdiction is not "so gravely difficult and inconvenient" to place the Bank at a "severe disadvantage in comparison to his opponent."  CFA Institute v. Institute of Chartered Financial Analysts of India, 551 F.3d 285, 296 (4th Cir. 2009).  The Fourth Circuit has noted three factors – burden on the defendant, interest of West Virginia as the forum state and the plaintiff's interest in obtaining relief – in conducting this analysis.  Id.

---

[7] United makes a passing reference to the so-called "effects test" outlined in Consulting Engineers Corp., 561 F.3d 273, as another potential ground upon which personal jurisdiction could exist in this case.  The Court will not consider this test because, as the Bank correctly notes, promissory estoppel claims sound in contract, not tort.  See George v. Laboratory Corp. of America Holdings, 522 F. Supp.2d 761, 765 (N.D.W. Va. 2007).  The "effects test" assesses if personal jurisdiction is appropriate in tort actions.  See Consulting Engineers Corp., 562 F.3d at 280; see also Carefirst, 334 F.3d at 398 n.7 (setting forth test factors).

In CFA Institute v. Institute of Chartered Financial Analysts of India, the Fourth Circuit assessed these factors in finding personal jurisdiction over the defendant satisfied Due Process requirements.  In examining the burden on an India-based defendant sued in the state of Virginia, the court noted the fact the defendant was able to secure counsel rendering the burdens of litigation "no more substantial than that encountered by other entities that choose to transact business in Virginia."  Id. at 296.  Like the defendant in CFA Institute, the Bank here has been able to secure competent counsel admitted to practice in West Virginia and before this Court.  Having secured competent and capable counsel, the Bank is situated no worse than any other entity based elsewhere that has sufficient contacts with West Virginia.  Although the Bank correctly points to the potential logistical issues associated with witnesses far-flung from West Virginia, the modern world of communication and technology has certainly lessened if not eliminated such obstacles.[8]  The Bank also appears to have sufficient resources to engage in commercial litigation.  See ECF No. 15-2 at ¶11 and Ex. 3.  Its own website

---

[8] As counsel and the Court endeavor to litigate and adjudicate during the COVID-19 outbreak, the world in which lawyers toil for depositions and the like has shrunk even more than before the pandemic with the prevalence of Zoom, FaceTime, Skype and other virtual discovery platforms.

notes it is the largest bank in Morocco with operations in twenty-four other countries and the sixth largest asset total of any bank in all of Africa. As the Fourth Circuit stated, defendants are "not shielded from liability" being "headquartered" in foreign jurisdictions. CFA Institute, 551 F.3d at 296.

The nature of United and the Bank's relationship also made the possibility of litigation foreseeable. See id. (noting "the inequity of being haled into a foreign forum is mitigated if it was reasonably foreseeable that the defendant could be subject to suit there."). Again, United made no secret that it was West Virginia-based company and operated in the coal industry here. United alleges the combined value of the ONEE contracts that necessitated the parties' relationship was combined in excess of $26,000,000. As the Bank spells out in its briefing, the ONEE contracts involved complex issues with multiple parties and international shipments of tons of coal. According to the Complaint, the Bank repeatedly promised United the letters of credit it needed to perform under the ONEE contracts and which were governed by the agreement(s) between United and the Bank. However, the Bank never fulfilled those promises. The Bank certainly stood to benefit from the relationship with a West Virginia entity or it would never have agreed to open accounts for United's benefit or promised the letters of credit described in

the Complaint.   That benefit was not the result of "random, fortuitous or attenuated" contact with United.   See Burger King, 471 U.S. at 480 (citations omitted).   The burden on the Bank is certainly manageable and not offensive to the Constitution.

The Supreme Court has long recognized a State's interest in providing an appropriate forum for its citizens to litigate and redress alleged injuries.   "A State generally has a 'manifest interest'        in providing its residents with         a convenient forum for redressing injuries inflicted    by out-of-state actors."   Burger King Corp., 471 U.S. at 473; see also BeoCare Group, Inc. v. Morrisey, 124 F. Supp.3d 696, 706 (W.D.N.C. 2015) ("Additionally, each state has an interest in resolving the grievances of its businesses ...).   This factor inures to United's benefit under the analysis.

Finally, United has "a valid and substantial interest" in litigating its rights here.   See CFA Institute, 551 F.3d at 297. United has been incorporated as a West Virginia corporation since 1979.   See West Virginia Secretary of State Business Organization Database,

http://apps.sos.wv.gov/business/corporations/organization.aspx?org=103882.   It seeks relief for the alleged breach of contract and other claims against the Bank which, as alleged in the Complaint,

skewered a business endeavor worth in excess of $26,000,000. United has a clear interest in obtaining relief.[9]

Based on the Court's analysis of all the required factors, the Bank's contacts and relationship with United satisfy both the West Virginia long-arm statute as well as the Due Process Clause. The exercise of jurisdiction here is constitutionally reasonable. Thus, the Bank's motion must be denied with respect to the jurisdictional challenge.

## C.   Forum Selection Clause

The Bank also argues United's Complaint should be dismissed based on a purported forum selection clause.  The Bank contends that clause is mandatory.  The Fourth Circuit has provided the following guidance on forum selection clauses:

> As a general matter, courts enforce forum selection clauses unless it would be unreasonable to do so. See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972). This presumption of enforceability, however, only applies if the forum selection clause is mandatory rather than permissive. See Albemarle Corp. v. AstraZeneca UK Ltd., 628 F.3d 643, 650–51 (4th Cir. 2010). A mandatory clause requires litigation to occur in a specified forum; a permissive clause permits litigation to occur in a specified forum but

---

[9] United also makes allegations against not only the Moroccan commercial courts but also the government of Morocco.  ECF No. 15 at 19-20.  This Court need not consider those allegations given its finding that United has a separate interest in obtaining relief in this jurisdiction and, therefore, this Court makes no findings whatsoever related to these accusations.

does not bar litigation elsewhere. Id. A permissive forum selection clause does not justify dismissal on the grounds that the plaintiff filed suit in a forum other than the one specified in the clause. See, e.g., Weber v. PACT XPP Techs., AG, 811 F.3d 758, 768 (5th Cir. 2016).

BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin., 884 F.3d 463, 470 (4th Cir. 2018).

Unless a forum selection clause contains "specific language of exclusion," the Court should find it to be permissive and conferring jurisdiction in one forum, rather than excluding other jurisdiction. Id. (citing Albemarle Corp., 628 F.3d at 651) (internal citations omitted). Forum selection clauses should not be found to be mandatory unless they describe a particular forum as the "sole" or "only" or "exclusive" forum. Id. at 472.

The Clause at issue here reads:

The Parties agree that all disputes concerning interpretation and implementation of this Agreement shall fall under the jurisdiction of the Casablanca Commercial Court. In the event the parties enter into other contracts such as a loan or security contract which contains different clauses concerning jurisdiction, the parties expressly agree to give priority to the jurisdiction provisions of these contracts.

ECF No. 5 at Exs. A and B. The plain terms of this provision do not purport to exclude any particular jurisdiction, including West Virginia. The provision likewise does not indicate an agreement

that the Casablanca Commercial Court is the "sole", "only" or "exclusive" jurisdiction for disputes between the parties. Instead, it conveys jurisdiction there but does not limit a party's right to litigate elsewhere under the clear holding of <u>BAE</u>. Defendant's motion with respect to the forum selection clause is denied.

## V.    CONCLUSION

Therefore, for the reasons set forth above, Defendant's Motion to Dismiss is **DENIED** as ordered in this Court's March 30, 2020 Order [ECF No. 32].

The Clerk is directed to forward this Memorandum Opinion to all counsel of record.

It is so **ORDERED**.

**DATE:**  April 14, 2020


                                  /s/ Thomas S. Kleeh
                                  UNITED STATES DISTRICT COURT JUDGE